Board of Education, number 19-3771. And we will start with you, Mr. O'Leary. May it please the Court. My name is Thomas O'Leary. I'm with Walsh-Pizzo O'Reilly & Philanthrops. It is my privilege to represent K.E. and B., and I would like to reserve two minutes for rebuttal. Granted. The parents are appealing from the dismissal of their children. I have been a regular participant in the due process petition, and as set forth in our opening brief, there were a multitude of errors that warrant a reversal of the district court's decision. There are three errors that I think are particularly significant and warrant further amplification. The first is the failure of the ALJ and the district court to properly consider all relevant factors as required by Forrest Grove. Chief among these was the risk of physical harm to the child. This resulted in large part due to the ALJ's decision to bifurcate the case and not follow the procedure established by Forrest Grove and Shore Regional, which required the ALJ to first consider whether Northern Highlands had offered a fate, whether it had complied with the IDA's procedural requirements, and then to assess the reasonableness of the parents' actions. The second significant error is the finding that the mother had agreed to the first 504 plan issued by Northern Highlands. A fair reading of that document is that any agreement by her was conditioned on Northern Highlands' acceptance of her handwritten comments. There was no communication of acceptance by Northern Highlands, and the district court erred in relying on Ms. LaRocker's testimony that Northern Highlands would adjust the child's schedule and keep him away from his aggressors. What Ms. LaRocker testified to was not in the 504 plan, and it was retrospective testimony. And this issue really begs the question of what exactly were these parents were supposed to rely upon in the summer of 2016 when they were in this situation that they found themselves in. Mr. O'Leary, I'm not really sure whether that second point really matters. Okay, okay. Okay, the third significant error was the adverse credibility determinations by the ALJ, which we did not think were appropriate and inconsistent with the non-testimonial extrinsic evidence. Mr. O'Leary, why wasn't there an opportunity for the parents to put in evidence of faith at either of the two hearings? Before I appeared in the case, Judge, there was a motion to bifurcate the case, and the ALJ entered an order bifurcating the case and limiting the proofs to three issues, which were identified in our opening brief, and that is why. Okay, but let's talk about the district court. In the district court, your complaint asked for an opportunity to put on more evidence, but after that, there was an October 18, 2018 letter that said, hey, we don't need any discovery. We're prepared to proceed on the ALJ's record. So I don't understand that there's any live issue here about putting in more evidence or not. If your predecessor chose to bypass adding more evidence to the district court, didn't he essentially say, yes, we're just taking this on the administrative record as it stands? How is that not at least a forfeiture, indeed, maybe a waiver of the right to supplement the record? Well, Judge, I mean, this was an appeal from an administrative hearing. We would have had to have a full-blown trial in the district court regarding whether or not a faith had been offered, and the court's statutory structure is set up that you try these cases in the office of administrative law. So it would have been inconsistent with the statutory scheme to try the actual merits of the case. But the point is they didn't hear from Dr. Healy or something else. You could have put the doctor's evidence in at the district court. Your complaint said you wanted to, and then your predecessor changed his mind and said, no, we're standing on that record. So how is there a viable remaining challenge in the case for the state of the record, as opposed to what are the proper inferences to draw? Should the mother's evidence have been interpreted this way? Was the credibility determination right? Or is it something that is even open for a remand? Well, I would, well, the neuropsychologist's report is in the record. So that is the substance of the testimony that she would have offered on direct. So it is in the record. So in that respect, I mean, you know, the district wouldn't have had the opportunity to cross-examine, but that is in the record. From our standpoint, you know, if you look at the four corners of the IEP that was offered and compare it to the Dr. Healy's report, it's clear that this IEP was inadequate and not reasonably calculated to offer a FAPE for this child. Counselor, can I just clarify? Do I understand you correctly that the thrust of your argument in the district court was that the ALJ erred as a procedural and legal matter in sort of putting the cart before the horse, addressing equitable issues without holding an evidentiary hearing as to FAPE itself? And you also were making some arguments to the district court to demonstrate your view that the ALJ erred in that determination of FAPE. But primarily, I take it your argument goes to the procedure that there was not a need before the ALJ in either of those hearings dealing with the issue of FAPE itself. Is that right? That's exactly my position. That's exactly my position, Judge Krause. And if this did go back to the district court or ultimately to the ALJ for a hearing on FAPE, can you explain to us what additional materials, what would be the nature of the evidence, the additional record material, you would then put into the proceeding if you had been given or were to be given that opportunity? Substantively, I would put the neuropsychologist on the stand and have her testify to amplify her opinions. But the substance of her report is in evidence. So it would really just, in terms of the child's disabilities and her recommendations, I would have elicit oral testimony from her. But a lot of those recommendations are already in her report already. All right. So, Mr. O'Leary, if the substance is in there, am I right that if I wanted to summarize the gist of your objection to the FAPE, is the gist that the IEP was developed was not, or at least we're not sure that the IEP was developed by persons knowledgeable about TE, right? Is that the hard objection to the FAPE? No, the hard argument is if you, by statute, the development of IEP must be based on the evaluations that are being, that are performed, and also, and the classification category of the child. The only evaluation that was performed on this child was the neuropsychological evaluation by Dr. Healy. There was no other evaluation in this case. I want to talk about that. So if the decision was, in fact, based on Dr. Healy's, then that was accomplished. The question is, was it based on Dr. Healy, which is in the record? And I guess that's what I want to probe about what we know was done here and what wasn't. I thought that the FAPE referenced, you know, cognitive tests that were done and motor skills tests that were done and other things like that. And it appears to track pretty closely the list of tests that Dr. Healy did at Appendix 297. It's drawing in all of the tests that are in that appendix to the doctor's report, the neuropsychologist's report. So why isn't that sufficient if it drew on all those tests? Or maybe you want to dispute the premise that it did. But it looks to me like the tests that they are reciting were done. You checked down the list. It checked in on this whole list of tests that are appended to Healy's report. Well, the IEP makes no mention of Dr. Healy's report. And she had a number of programmatic recommendations that are not mentioned at all in the report. And that goes to the adequacy of the IEP. And if you look at the IEP itself had no very limited goals in addressing the areas of disability. In other words, there was no proof. And the other thing, too, is the district, meaning Northern Highlands, had the burden of proof to demonstrate that they offered appropriate programs. And typically on these cases, they go first. And there was never any evidence put in on this as to why they thought this program was appropriate. Council, in that demonstration of FAPE, the standard is whether the IEP being offered is reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual, potential, and individual abilities. Correct. Did the ALJ in this record, either orally or in writing, conduct any analysis as to whether this IEP met that standard and in what way it met that standard? The ALJ, Judge, conducted absolutely no analysis. None. Mr. O'Leary, what is the relevance of the parents putting the child, P.E., into a school that doesn't offer special education? As I understand it, this is not a school that is set up for a lot of special education that most of the recommendations in the report are not being implemented. Now, you can tell me I'm wrong. Maybe you can cite me specific things that are being done that was in Dr. Healy's list that were not proposed to be done by the school. But as I understand it, he's not getting, you know, a comprehensive special education program at this new private school. What's the relevance of that to our institution? Well, generally, the case law, when a parent makes a unilateral placement, they're not held to the same standard as the district in terms of developing a comprehensive placement. Okay. Maybe not comprehensive, but how is the gist of special education being given? Right. The program has to meet some of it that's being offered and it needs to meet some of the child's needs. And the mother testified that there was a learning consultant at Dwight Englewood. There was also a psychologist at Dwight Englewood. And I was never given the chance because of the bifurcation to put these proofs on. But, I mean, if we had been given the chance to put in the evidence, we would have established that it was an appropriate placement for this child's needs. All right. Let's connect that up to needs. I don't know. Maybe you want to dispute this characterization. But it looks to me like the child's needs, and you've stressed physical safety, the child's needs appear to be less in the classic special education context. Though there are some for more time on test, more reading, and more, at least more immediately, in the need of physical safety from bullying. Now, we have case law that says bullying can be relevant. But I want to understand how this fits together. You know, what could or should Northern Highlands have done to ensure protection from bullying? I mean, one of the recommendations in Healers Report number two is this child can't be in a large public high school at all. So maybe you're taking the position that it never could have been because the doctor found it was categorically a bad fit. But I'd like to understand how the bullying aspect fits here. Well, I would say two things. You know, Dr. Healy would have to explain why she offered the recommendation that she did. But the Department of Education, the U.S. Department, by the time this case happened, the fact that it happened, the U.S. DOE had been issuing guidance letters for more than 15 years on how to address bullying. And there was an October 2014 guidance letter where the U.S. DOE stated that at a minimum, a proper response to bullying is to make sure that the parents and the child know how to respond or know who to contact at the school if there's a problem. They were never told that here. They were never given that. So it kind of goes back to, you know, the parents found themselves in this situation. You know, what were they supposed to rely upon at the time? And so they took the action to protect their child, and that's what they did. Council, given that the ALJ went ahead and looked at the equitable factors, and, of course, the ALJ has discretion, even if they were not provided, to both reduce and, if it chooses, to eliminate reimbursement of tuition. Since the ALJ went ahead and conducted that analysis, is any error as to the failure to conduct a hearing specifically as to FAPE harmless? I think there was error in the ALJ's analysis with respect to the exceptions that are applicable. The first, you know, the father sent an email on August 11th, which was a Thursday, and he forwarded the email from Principal McCusker dated August 9th, which confirmed that they had to put an aid on this child for physical protection. The father received no response on Friday, received no response the following week, and he emails again on Monday, August 22nd, and makes a separate request for a meeting and is basically told he's rebuffed and told the child study team will meet after the evaluation is committed. If the parents had sent a notice letter the next day, there would have been less than 10 business days before the start of the school year on September 6th. So, you know, in terms of the application of the statute, why we disagreed it applied, the application of the statute, the ALJ erred. And so, you know, we still don't... Can you tie that up with the statute itself? Are you arguing, in other words, that the exception under subsection 4A, 1AA applies? That is, that the school prevented the parents from providing notice? No. Because the placement is the IEP, and the placement has not been issued yet. No, I'm arguing the risk of physical harm to the child. That's the issue. You know, I'm not arguing that the school precluded the parents from doing anything. Let me ask you from a real sort of grassroots fundamental perspective. How old is K.E. right now? He graduated from high school last year. Okay, so are you asking us to remand this for a do-over? I think ultimately that's what would be required to develop the record, yes. All right, and how long would that take? In terms of a hearing? Yeah. I think it would probably two or three days because... No, no, no. How long would it take to have a hearing, to have an opinion issued, to bring this to some sort of conclusion if we were to remand it? Right now, it takes more than a year and a half, two years to get through due process in the Office of Administrative Law. So if we got to remand, we could be looking at an extended period of time. So we're talking years from now, right? Yeah, I mean, yes. K.E. would be in his 20s. Yeah, that's true. But, I mean, by federal code, you know, these cases are supposed to be tried and decided within 45 days. I get it. I'm looking at it from a more pragmatic perspective here. Right, right. Let me just follow up on that in terms of as to the pragmatic issue, I take it you're contesting the faith that had been offered in October. Correct. Right? Correct. So if this were heard, for example, you know, in another year and a half before the ALJ, what you would be looking for is not a different IEP to come back to the public school. At this point, you're seeking reimbursement retroactively for the parents. Correct. That's correct, Judge. And to that extent, the reimbursement of what is the tax, what's actually at issue in terms of the parents out of pocket outlay as a result of reimbursement being denied completely rather than, for example, reduced? The tuition is roughly about $40,000 a year, so we're looking at four years of tuition, and then there's some associated expenses with therapies and stuff like that, which are not particularly significant. Okay. That's assuming it's all four years and that's assuming it's complete reimbursement rather than very substantially reduced based on these credibility findings. So the school might have gotten that right after a year. We might be looking at a year discounted by a large fraction. So your ballpark initial ask is $200,000, but when it comes down to it, we might be in the low five figures now. Well, we don't. I guess we're not asking you to speculate about the amount of reduction of the award, but you've indicated what the range would be from zero up to that. Is that correct? That's fair, Judge. Yes. There's an attorney's fees. Yes. Then there would be prevailing party fees, which are significant. Yes. And are there prevailing party fees? I mean, if there was a violation of faith, and even if there's a substantial reduction, are the parents still then the prevailing party? Well, they're still the prevailing party, but then the court would have the discretion to modify the amount of the attorney fee award based on the degree of success. That's typically the way it's handled. Okay. Okay. All right. Well, unless my colleagues have other questions, we will come back to you with your rebuttal time. All right. Thank you. Mr. Plosia. You're not on mute. I just unmuted. I'm sorry. I have nothing to add in terms of what the copy was, but I'm sure the court has questions. So I'm happy to try and entertain the answers to the questions.  O'Leary's points were already, I believe, fully briefed. I don't think there's anything he raised, which is appropriate. That wasn't in the brief. So I'm happy to try and answer questions if I can help the court. Mr. Plosia, I'm getting a lot of feedback. I don't know if there's a way to adjust your microphone. I just unmuted. I don't have anything else on that I'm aware of. Mr. Plosia. This is Greg interjecting. Sorry for the interruption, but maybe if you were to just move a little bit back from your device, it might be that you're just too close to it. How's that? Is that any better? Is that any better? It's a significant delay. It may be my internet. I've had four this week. They all worked well. So maybe my luck ran out. I don't know. All right. Okay. Well, that, that distance seems to be best. If you stay about where you are right now. Okay. So. The parents. We're arguing to the district court. Primarily they were denied. Procedural process in the sense that. There was no hearing in before the ALJ. And the district court. And the district attorney. As to faith. And. Our. Third circuit. Law. Says that. It needs to be addressed first. Before looking at whether a reduction or elimination of. Of tuition is appropriate. Okay. Thank you for that. Since there was not a hearing. Why shouldn't we remand for the development of a record on the issue of faith? That that threshold issue. It's certainly a legitimate argument. I think Mr. O'Leary and I were both somewhat surprised by the ALJ decision. I would submit on behalf of the district that I believe judge McNulty. Address this sufficiently in his decision. And of course that's the decision that's being appealed to this court. Not the ALJ decision. As I understand the case law and it is. It's it's. There's a lot of case law and it's. It's a little bit all over the map with respect to the 10 day notice. Requirement. Okay. If in fact the facts in the case would demonstrate. That the district's inability to, or refusal to. Offer faith. Needs to be considered as part. Of the necessity or the lack of necessity of providing 10 days notice. Then in that context, factually. I believe the faith issue is appropriate. In this case, I think judge McNulty. Properly found. That since the student was the tuition was paid for in July of 2016. The student was enrolled in. In September of 2016. And we did not receive the notice of the. You know. You don't have a placement until November, 2016. A month after the IEP was promulgated. So, I think, you know, I think it's appropriate that in that factual context. The district's theoretical failure to offer faith. Could not possibly be an equitable factor, which needs to be considered. In terms of the failure to give the requisite 10 days prior notice. You're talking about the need to provide faith as an equitable factor, but the need to provide faith is. Is an absolute need under statute. Right. It is judge, but if the parents. Behavior precludes the possibility of offering faith. Which is what judge McNulty found. Then in that context, I believe he correctly found that. The parents ability to obtain reimbursement should. It's not that the decision doesn't discuss faith, but. Most of these cases, not all, but most. You marched through and you determined was faith offered. If no, then you apply the equitable factors. This is very strange. It's very strange in that everybody's been focusing on the equitable. Factors to reduce the award without first focusing on whether the district. Was on the hook. So. You know, it's a troubling set of rulings below that give one pause as to whether or how thoroughly this was all. Applied. Not that you can't write in a different order, but. Might we have questions about whether this was done in. As thorough and consistent a matter as the statute requires. I understand your honor. And it is. I would say different as opposed to troubling, but we could quibble on words. I would ask the. Okay. The case law in this area. Involves students that were already enrolled in the school district. And the school districts had. Been given the opportunity sometimes over a period of years. To provide faith. And eventually the parents. Throw up their hands collectively and say. Enough. This. Doing what they need to be doing. I'm going to, you know, I replaced my child in a, in a, in a private placement. And. I'm sorry. The cases. Forest Grove for regional Richardson Anchorage. Blount. I mean, there are numerous cases where parents have unilaterally enrolled their child in, in a private placement. And without having given notice. And then subsequently seek and obtain reimbursement. Even with some reduction. Here are the parents. It appears didn't have the opportunity to make the case on faith. At least that's their argument. And. As such. How can we even be confident that the ALJ or district court. Had there been a finding that state was not provided.  Had provided. Would still have. I held that no tuition. I should be reimbursed as opposed to giving a reduction in view of an absence of faith. If there were such a, such a finding. Without going into the individual facts of the cases that I know we've had a lot of cases in our brief as did Mr. O'Leary. The private placements, your honor, that you're referring to, I believe all involve situations in which the school district. I've already been given an opportunity to provide services through faith. To the student. In this context, we did not even. I get the student until July 1st, 2016. Even though we had preparatory meetings in June of 2016. Because it's a K district where the student came from. The student. We could not have possibly offered any services until September of 2016. At which point the parents had already paid tuition to the private school. And B. Actually started the student. And recall that the district was waiting for. The parents selected expert. Dr. Healy to complete. Our neuropsychological evaluation. And before that happened, there was nothing. The district could do. In fact, the student wasn't even classified yet. And that was the basis for the evaluation to determine eligibility. Potential services. Isn't that the point that we're at the school. I'm here to hear the school had the opportunity to, and ultimately did. Make their proposal as to what constituted faith. And it did so. In October. You've, you've, you've just discussed some reasons for it, but. The school didn't make that proposal. Until. School had already started. So isn't this the very situation that the Supreme court was addressing. In the school commission. Of town of Burlington versus department of education. Where. It, it made the point that if parents are. If parents are. Just either disagreeing with the proposed IEP or don't have one and have to make a decision about the. The wellbeing of their child. That's. They, if they, if they weren't able to seek reimbursement. Even years later. That the right to a free and appropriate public education would, would be meaningless. There has to be that opportunity. Even if there's been a unilateral withdrawal. And even without notice. There may not have to be reimbursement. But doesn't there have to be the opportunity to make the case. And that faith was not provided. To answer that question in the negative. And that I think is the crux of what you're being asked to consider. And among the facts, judge McNulty cited was a number of things. First of all, the parents didn't make any additional requests for services. Between June 12th of 2016, when the mother signed the section five report plan and October, when the meeting finally took place. So what judge McNulty found was that the district did everything. It was supposed to do to lead up to offering. The opportunity to review the IEP. It was denied the opportunity to do that. By parents who a, you know, I replaced the student. In a private school. And B did not even consider the language of the IEP that was proposed in October. Because it's an undisputed fact that the parents appeared at the meeting. And rejected the IEP before they even had an opportunity to review it. So. They're going to hand it to them at the meeting in October. And. But they've been made the case that that did not provide faith. And we're seeking. In their administrative hearing the opportunity to make that case. I'm sorry. For the difficult in the transmission, but I'm not sure. I understood what your, your answer was. Why, why under the case law, aren't they entitled to that opportunity? To make a case as to faith. In this case. They do not have the opportunity to make the case because they had already decided. To place the student unilaterally. The student had not been classified previously by the school district. The student had never received any services from the school district. And the parents raised no objection. To the 504 plan that the mother signed on June 12th. In that context, the district couldn't have done anything else. And judge McDonald basically said. It was a fait accompli. The parents had already decided. It didn't matter what the district was going to offer. In October. The family didn't even consider what the IEP said, because they rejected it at the meeting in October. Before I didn't even look at it. So in that factual context, judge McDonald found, and I believe he found correctly. That. The state issue need not even be reached. Because of the patent conduct and there. Basically closed mindset that they were not going to put the student in Northern Highlands. Regardless of what the IEP proposed. Said from October, 2016. Mr. I understand you are stressed. Why you are stressing so hard that the parents acted unilaterally, but here T E was matriculating at Northern Highlands high school with the same students who had bullied him at Cavalini. And we're not talking about ordinary bullying. We're talking about someone who. I had serious injury inflicted upon him. Do parents always have to wait and give the school a chance before they pull the child out. For his safety. I mean, might it be the case as dr. You know, he was suggested that. This child could not be safe in a large high school with the kids who were inflicting injury, you know, dropping him on his head and. You know, Piercing him with a pencil, other horrific injuries here. Yeah. To address the second point first, your honor. In terms of a large public high school. I did. I know we did address this in our briefs. Large is not simply a matter of numbers. It's a matter of square footage. I don't know how many students. I don't know how big the facility is. I do know that Northern Highlands, which has approximately 1200 students. Has the capacity for 2000 students. So the size alone, I think is, is a non-factor based upon the record. Before this court. And back to the first point. I believe that the record shows. That we only knew the district. You have one of the students who allegedly bullied. Te was going to know that. Highlands. We had talked about. Avoiding scheduling where any of those students would be in the classroom. We had talked to the parents about a number of ways of addressing this. And from our point of view, from the district's point of view. The parents just kept saying, well, can you give us a guarantee? Can you give us a guarantee? Well, the answer to that is no. There are no guarantees. I never tried. I know what it was. My client's full district. I don't know. Judging that adequately answers your question. But, but I think that's the district's perspective on it. Is that we were perfectly willing to try and deal with this. And I guess I'd add one more thing. If in fact, those circumstances, those horrific circumstances that occurred at another school district were such. That. This student could not go to school with the students who had bullied him. Why wouldn't that be a percent of everybody's responsibility financially? The bully took place there. It was their alleged failure to address the bullying that took place there. Now the parents settled with upper side of the river for $25,000, which is. A little bit more than half of one year's tuition factoring out of course, legal fees that are now involved. I'm not sure why Northern Highlands would be paying over $160,000. Not to mention legal fees. For a situation that. I think the parents and their expert is saying. This student could not possibly go to Northern Highlands. If any of the students who allegedly bullied him. I don't know. Are in Northern Highlands. I'm not sure what my client is supposed to do at that point, other than offer potential safety issues. Resolutions, which we tried to do. I don't know.   I don't know. Had the parents. Maybe choice to purchase. Or engage security themselves. Like the full-time having a full-time adult president, which appears in the record to be one of the things that they had raised. As, as a possibility. I guess the question is,  If they had gone ahead and hired someone and gone forward. They would not have had the opportunity to seek this reimbursement. If the school had refused that. And they accepted the IP as such, and then privately. Engage someone. So it isn't the answer simply that this comes down to faith. And if. If they had gone ahead and hired someone. Under the IDEA, either they're entitled to. Reimbursement. With the conditions in the, in the statute. Perhaps with reduction. Or denial. But the statute allows them to at least make the case for a parent being permitted to hire in effect, private security in a public high school. But I guess it's theoretically possible that that could happen. But I would ask the court to keep in mind that the district did not offer an aid. And there was no aid provided to the student at Dwight Englewood school. And as far as we know, he went to the school for four years and he graduated. It is, it is not a special education school. It is a private preparatory school. They may actually have a child study team. That was not part of the record. But certainly, you know, in terms of our district, my client's ability to offer special education. I think everyone would agree. Even Mr. O'Leary would agree. That my client is much better postured to provide special education services. As to the safety issue. And, and I don't understand the parents. To have limited their objection to that. I think that, you know, I think it's a good point that the IEP offered to, to safety alone. But to the extent it relates to a safety issue. They were asking that there be an adult. Present. At all times. As again, one of the things they raise and one of the things that it appears on this record, the private school was able to provide them. I believe this was part of the record and I don't have the citation in front of me. I apologize. As you get older, you can't remember everything, but I do know for a fact that, that we raised at least an argument. I thought we did in testimony. That the law in New Jersey is that public school students not only have to be with an adult at all times. Supervised. They have to be supervised by a certified staff member. So the idea that we had to do something different in Northern Highlands to have adult supervision by certified staff. It simply was going to happen. It has to happen as a matter of law. Students cannot be left unattended. And in fact, when they're in a classroom setting or in a, in a, in a extracurricular setting that could be certified staff present with, with those students. And we did make that clear at OAL. I think through testimony, I know through a representation or proffer to the court. So it wasn't like Dwight Engel was going to be able to offer anything in terms of adult presence. That Northern Highlands either couldn't do. Or was legally required to do by law. You read the, the, the five Oh four plan. And I guess one or two to address that for a moment, because. You know, obviously when, when, when there's a, a meeting held with a school district and parents. There are several points that a parent is asked to sign as, as, as this document reflects. And they relate to different things. One of them being that they're in attendance. One of them being that they've received certain documents. And one of them being that they agree to the substance of what has been offered. And they are accepting that as, as faith from their perspective. In this case, the, the, the, the, the, the, the five Oh four plan and the five Oh four plan. And we're dealing with the five Oh four, not, not the, not the IP per se, but. So we're here and has acknowledged their presence at the meeting acknowledged receiving documents. And, and refuses to find the agreement. To the terms. How can be the ALJ. And district court. Affirming it. The, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the, the. Make a, a finding. That would stands clear error review that the parents accepted the actual substance of the proposal. I believe your honor. Both the ALJ and judge McNulty would respond to that question by stating. It's not simply a matter of what was being signed. No, not really.  Not, not explicit. Not significant to what line was being signed. But the fact that the parent hand wrote in. Six or seven specific programmatic suggestions or requirements. If you will. To that document and then the parent signed it. So I think the ALJ and just be multi both would say. Well, not only was this a matter of the parents signing it, the parent wrote down seven suggestions, which the district agreed to agree to comply with. And in that context, they're both found. And I think appropriately. So that was a meeting of the minds as to the 504 plan. I mean, we're, we're in the record. Is the district's agreement to what the mother had written in. I'm sorry. I missed the last part. When the record is the districts. So I I'm looking now at joint appendix three 56 through. Three 58. And I'm, I'm wondering where, where, where there's agreement. And where is her signature as to. Her actual agreement. With the plan as written. The first question. I believe the answer was there isn't anything in writing that says that the district agrees. To implement the parents handwritten changes. I believe what, what both courts found below was that the document was proffered by the district to the parent on June 12th. The parent says, well, I have some changes I want to see implemented in this 504 plan. The parent writes down the changes. And then the parent signs the document. I'll be arguably not in the correct space. But from the district's point of view, we offered. The 504 plan. And did in the meeting, except the parents had written changes. Okay. So you you're, when you say that, that the parents. I'm signed in there in agreement to the 504 plan. You mean the signature that appears on three 58. Under under the. The place where the parent did not sign. I agree with. I agree with that. The 504 plan is written. Correct. And I guess the other thing to consider is what happened afterwards while there was some discussion about potential modification. Those that discussion, those suggestions came from the district's perspective and the district side. And I judge McNulty. I know specifically made reference to the fact. That the parents didn't offer any suggested changes, modifications, rejection, anything. Of the June 12th plan. So that. As far as we were concerned, Northern Highlands. And I don't think there's anything in the record to indicate. Otherwise from the parent's point of view. That June 12th plan was to be implemented until. I remember I supplemented by. An IDEA. And. I pay after the evaluation has been completed. Hi. And I'm Mr. Pelosi. I am. Is it also your understanding that. If this were to be remanded. And. If there were a finding as to faith, but nearly a reduction as opposed to. Denial. Of reimbursement. That the parents would be prevailing parties. My understanding is they would be. And if, as I understand. And. Fortunately, I haven't had that happen too often, but three or four times in the past, I have lost. I believe the analysis in terms of what you recover. It is similar to the legal analysis for prevailing parties under various civil rights acts as in a 1983 action and alike. So while there can be a reduction of the. Overall fees recovered based upon an alleged lack of full recovery on the merits. There also can be a finding that the parents are entitled to their entire legal fees. Even if they did not recoup. The entire amount. So as, as. Was discussed a bit earlier. This is clearly about money. Because the student already graduated and presumably is in college. Virtual or otherwise. The tuition is about $160,000. I don't know. Mr. We haven't had a fee output in yet, but I would venture to say it's going to be double and perhaps travel that amount. So you're talking about potentially a half million dollars. One third of which would be the. The tuition and another potential two thirds or more. Would be the attorney's fees. Which might or may not be subject to reduction. After, if there was a remand by the court and a hearing on the merits. I'm not sure. I'm sorry. There, there, there are, in other words, there's significant amounts on the line for both the school district and the parents. As there often are in these cases, they're very hypothetical. Theoretical and very interesting. But, you know, So underneath the service is always the money and underneath the surface of that is always prevailing party legal fees, which is. Your honor is well aware. It is almost always the biggest nut when it comes to these cases or   I'm sorry. When it comes to the discrimination cases for that matter. Okay. All right. All right. Thank God. Thank you. Mr. Thank you. I will have a. Is there. Anything you'd like to address on rebuttal, Mr. Leary. Just a couple of things. Judge Krauss. Mr. Rocket testified. On direct that. The parent's decision to sign a Roman contract had no impact. On what? Anything the child study team intended to do with respect to this child. Northern Highlands was given the opportunity to offer a favor. And they asked for a neuropsychological valve. They got the evaluation. They didn't ask for anything else. So they were given the opportunity to provide a faith. The other thing is. The, the, I, if you look at the IEP, that was, was offered. It minimized the bullying that this child endured. It talked about how the parents were upset that the, that the, that the children were not empathetic. So the suggestion that. You know, we would have accommodated the, the, the serious safety needs here. It's really not supported in the record judge. And then lastly. With regard to the payment, there was a statement that the tuition was paid in full in June, in July, 2016. If you look at the enrollment contract right above where they signed, there's a box where they checked the pay and installments. The father testified on direct. That they had agreed to pay a percentage. The mother said they had paid in full. So the record's not really clear on exactly what was paid. Although I admit there was a finding below that they had paid it in the tuition in full. And then lastly, I'd like to point out this. There was a severe safety issue here. Dr. Healy. In a report. That the child had suicidal ideation. He had talked about killing himself. That's a J a. Three 24 in the appendix. And he was also having. Reactions or behaviors that were. Described in the medical literature as, as catastrophic reactions. That's a J a three 27 in the appendix. And she also diagnosed him with a depressive disorder. Not otherwise specified. And that's a J a three 37 in the appendix.  And that's a J a three 27 in the appendix. Dr. Healy evaluated this child in August, 2016. Right in the time when all this was going on in the parents. Did what they did to protect their child. But under the, under the, under the facts here. I think they were denied an opportunity to present their case. And the record should be fully developed. And then the court can make an appropriate ruling based on a full record. Mr. O'Leary. I have a factual question. You've you've. Complain or criticize the ALJ for. About your not being able to put an evidence, but I've looked. And I can't find in the record where the ALJ. Hold your predecessor. You couldn't put on any witnesses. Other than Katie and B E. Are you aware of anything? Can you cite anything that prevented? Putting on Dr. Healy. Well, I'm just. I I'm relying on the order that was entered judge. And the order kind of limited the proofs and limited the scope of the hearing. Okay. And that's really. Okay. And I came in and remind me, I came, I entered an appearance. Probably about a week before we tried the case. I understand. Citation in the record. So I can see whether it barred. Putting on Dr. Healy. There was, there was no order bar and Dr. Healy. As far as I know, but the, but, but the report went in. And I think that her report itself. Would have covered her direct. And given the limited scope of the hearing, I thought that was sufficient at the time. Okay. Thank you. I may ask. This case has a. Obviously a long history. And if. Depending on our disposition. Would perhaps have a long future. At any point here, have the parties. Attempted either mediation arbitration. Well, judge, there has been an attempt, but it's been very difficult to get a resolution. In light of the opinion below with the adverse credibility determinations made against the parents. And what was happened. If there were a. A reversal and a remand. I would suspect there. It'd be a resolution might be possible before an actual. Full-blown hearing on the merits. All right. Okay. Thank you very much. Well, thank. My colleagues. Anything further. No, your honor. Nothing further from. Okay. Okay. All right. We thank you both council. For your arguments and, and for your excellent briefing. And so we will take this case.